# EDWARD A. NIERENGARTEN, JR. v. STATE DEPARTMENT OF HIGHWAYS.

163 N. W. (2d) 862.

January 10, 1969—No. 40744.

*Robins, Davis & Lyons, Arnold M. Bellis,* and *Stanley E. Karon,* for relator.

*J. W. Keeler,* for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Peterson, and Frank T. Gallagher, JJ.

MURPHY, JUSTICE.

Certiorari to review a decision of the Industrial Commission filed December 7, 1966, and reaffirmed by the commission in an order denying petition for reargument filed January 12, 1967. It is contended that the commission's decision is perverse, unwarranted, and contrary to the great weight of the evidence.

The record reveals that at the time the employee, Edward Anthony Nierengarten, Jr., was injured he was 25 years of age and held a degree in aeronautical engineering from the University of Minnesota. After completing a 2-year military obligation, he had secured a position with the Chrysler Corporation as an engineer. In the interval prior to the time this employment was to begin, he accepted a temporary position with the Highway Department of the State of Minnesota, beginning September 8, 1964.

His work for the state involved the inspection of aggregate and the operation of a scale used to weigh trucks. On September 25, he was told, due to inclement weather, to report to another work station and there to move file cabinets. While he was lowering one of the cabinets from a dolly, an intense pain developed in the middle of his back. This incident occurred about 11 a. m., and because of the pain the employee went home about noon. His condition improved over the weekend, and he was able to return to work the following Monday, September 28. He worked 8 hours on the 28th of September, 13 hours on the 29th, 10 hours on the 1st of October, and 13 hours the 2nd. He said this work caused him some pain but he made no complaints.

On October 2, the employee went to his parents' home in New Ulm, Minnesota, intending to hunt over the weekend. He did not hunt the next day, however, since he was late for his appointment and his hunting partner left without him. During this visit he did not engage in any strenuous physical activity. The injury which is the subject of this litigation occurred on Monday, October 5, 1964. The employee returned to his place of work about 8 a. m. and performed various duties during the morning. He admitted to an irritating pain in his lower back which began about 8:30 a. m. but denied that the pain radiated into his legs. There was testimony given by his superior, James Griffin, that the pain

was severe enough to cause the employee to lie down about 10:30 a. m. in order to obtain relief.

It appears that the plant was shut down between 9 and 9:30 a. m., and there was no work for the employee to do during this period. Griffin then assigned the employee to go to the scale shack with his coworker, Joe Doherty, to perform truck-weighing duties when the plant started operating at 10:30. At about 12:15 p. m., there was a break in the work because of a backup of trucks waiting to be checked out, and the employee went to his car to get his lunch sack. In running back to the scale shack, he testified, he lost his balance in stepping across a shallow trench adjacent to the shack and—

"* * * landed flat-footed on the bottom [of the trench]. As I landed I twisted and jarred my back which threw me off balance. I slammed up against this scale house and at the time that I landed I noticed the tingling in my leg and as I slammed up against the scale house I had this intense flare up in my back, intense pain at this particular time."

The employee went into the scale shack and told Doherty what had happened. He was unable to continue to work because of pain, and arrangements were made for him to go to his rooming house shortly thereafter. Sometime that afternoon, the landlady's husband took him to St. Joseph's Hospital in St. Paul, and the next day he was transferred to St. Mary's Hospital in Rochester, Minnesota. While at St. Joseph's Hospital, he was visited by another superior, Kenneth Johnson, who was given the facts relating to the accident. It is of importance to note that while the report of the accident was not prepared until October 8, the information contained in it was given to Johnson on the afternoon of October 5, the date of the accident. The report contained the following statement:

"Employee was returning to his duties in the scale house. He ran down the slope approaching the bldg. when he landed flat-footed and jarred his back. His left leg became paralyzed in 5 min. & his right leg 25 min. later."

The employee's disability was diagnosed as being the result of an arteriovenous malformation. Blood vessels had burst causing a block

in the spinal cord. On October 7, 1964, a ligation was performed. The prognosis for recovery is slight, and the likelihood is that the employee has sustained a permanent spinal paralysis. It was the opinion of Dr. Jack P. Whisnant of the Mayo Clinic that the tripping, loss of balance, and flexing of the employee's back while going over the slope on October 5 resulted in rupture of the preexisting anomaly in the intraspinal space, thereby causing the sudden pain and ensuing disability. Dr. William Chalgren, attending psychiatrist and neurologist, stated:

"My opinion is that the peculiar torsion and blow of landing on his feet with his back being twisted in that particular fashion caused a rupture of the blood vessels in this malformation, causing his present condition * * *."

The employee's medical history includes a back injury which occurred in 1954 and was occasioned by lifting logs. This injury had caused pain for about a week or two and weakness in his legs for about 3 or 4 months. He had, however, experienced no other back problems until the incident which occurred on September 25.

As we have indicated, the Industrial Commission denied compensation vacating a referee's award. The commission simply concluded that the employee did not sustain a work-connected disability. It said:

"* * * [T]he employee herein did not suffer an injury or an aggravation of a pre-existing congenital condition diagnosed as an arteriovenous anomaly in the spinal cord."

The commission appears to have been strongly influenced by statements made by the employee subsequent to the accident. One of these statements, which is an account of the accident and the employee's experiences, was prepared by him and referred to as a "Prelude to Myelogram." The other statements are histories given by the employee to medical examiners. We have examined these statements, and while it appears that the employee did not precisely state the detailed circumstances of his injury, we find nothing in them contradictory or inconsistent with the employee's original version of how the accident occurred. Nevertheless, the commission reversed wholly on the basis that the employee's testimony was exaggerated and unworthy of belief. It concluded that if the employee

had actually sustained the injury, his statements to the doctors as to how the accident occurred would have been more precise.

We have carefully measured the commission's decision against the facts contained in the record, and in view of those facts, we are at a loss to understand how the commission reached the decision it did. A brief comparison of the record with the commission's memorandum will explain our difficulty in reconciling the facts with the result. The commission's memorandum states:

"* * * The alleged injury occurred October 5, 1964; was reported to the personnel department 3 days later, October 8th, by the district materials inspector-engineer. * * *

* * * * *

"It was not until October 8th, three days later, that the history began to take on a differing hue."

"* * * At the hearing in November, 1965, the history was further embellished."

The commission was of the view that the employee changed his story over a period of days and months after the accident in an intentional endeavor to create a basis for liability. We cannot agree that the facts and inferences contained in the record justify this view. As we have already indicated, the employee's supervisor was given a clear statement of the circumstances of the accident on the day it occurred. The employee's description of these circumstances, as reported at that time, was maintained throughout the entire proceedings. Moreover, Doherty's testimony concerning his hearing someone bang into the shack, his observation of the employee in an obviously disabled condition, and their conversation in which the employee said that in approaching the shack he had stumbled fully substantiates the original statement.

The commission's memorandum states:

"* * * Statements up until the claim petition was filed, including one by the employee himself, were silent as to any incident significant enough to have precipitated or aggravated the * * * condition * * *."

This statement wholly disregards the evidence already referred to as well

as the testimony of Dr. Chalgren, who examined the employee on May 3, 1965, and said:

"Well, he said the illness began on October 5, 1964 when he suddenly developed pain and paralysis of his legs. He was running down a slope when he slammed his feet together, jumping the final two feet in front of a building and suddenly got pain in his back. Shortly thereafter the left leg did not work and his right leg became—and then his right leg became paralyzed."

Moreover, it is difficult to reconcile with the record the commission's assertion that there was no corroboration of the back-jarring misstep and stumble. The commission concluded that "[w]eekend activities could just as well have been a causative factor" in the employee's injury. There is nothing in the record to fairly warrant such an inference, particularly in view of the testimony already referred to, including that of the witness Doherty.

Nor can we agree with the correctness of the commission's statement:

"The testimony of a co-worker that morning that he heard a 'thump' on the side of the scale shack * * * was not corroborated by the testimony of another worker present that morning."

This statement appears to be misleading and inaccurate. The reference is obviously to the witness Griffin. Griffin testified that he was not present at or near the scale shack when the employee left to get his lunch nor when he returned. He did not come to the scene until Doherty called him to the scale shack after the injury occurred.

The commission apparently discounts the employee's direct testimony by inferring that he falsely testified as to the prior state of his health. We do not find that the record warrants this inference. The employee openly disclosed and discussed his prior experiences, and medical evidence of an event 10 years prior thereto was presented by old records which indicated that the employee lost no time from school and was not hospitalized. The record establishes that after that incident the employee participated in intramural sports, hunting, fishing, camping, climbing, and 2 years' active duty in the United States Army. He passed the mili-

tary physical examination and carried on military activities without restriction. He incurred no back difficulty until September 1964.

Nor will an examination of the record permit us to go along with the commission's statements:

"* * * There is medical opinion that the hemorrhage began before he reported for work that morning * * *. * * *

* * * * *

"* * * [T]he factual evidence indicates the employee was hemorrhaging at 8 a. m. * * * and obviously was doing so at approximately 10:30 a. m. when he was lying on the floor."

We find no evidence that the employee was hemorrhaging at 8 a. m. before work. He testified that he had no pain before arriving at the plant that morning. He incurred pain about 8:30 or 9 a. m. after doing some work. At that time he had some low back pain but no pain radiating into his legs. According to the witness Doherty, the employee worked without incident and made no complaints prior to his fall.

In oral argument in this court, counsel representing the Department of Highways made no attempt to explain or justify the statements of the commission nor to point to any facts in the record which would support them. In view of the action taken by the commission, it was not surprising that counsel for employee would petition the commission for reargument pursuant to Rule 27 (a, b) of the 1957 Rules of Practice and pursuant to Rule WC 14 of the Rules and Regulations filed on January 31, 1964. The thrust of this petition was to call attention to the numerous contradictions between the memorandum and the evidence and to represent that the employee was entitled to have the credibility of his testimony reconsidered by the commission.

■ In disposing of the issues presented for review, it is unnecessary to dwell upon the innumerable authorities which have expressed the rule that the findings of the commission are entitled to very great weight and will not be disturbed unless they are manifestly contrary to the evidence. 21 Dunnell, Dig. (3 ed.) § 10426. We have also said that if after an impartial consideration of the evidence and of the inferences which may be fairly and reasonably drawn therefrom, reasonable minds might reach dif-

ferent conclusions upon the question, the findings must stand. Where, however, the conclusions of the commission are manifestly and clearly contrary to the evidence, as they appear to be here, they cannot stand. It seems to us that the conclusion of the commission that the employee's claim of injury is simulated, exaggerated, or embellished is wholly unwarranted. If we were finding the facts in this case, we would probably reach the conclusion that the injury sustained by the employee, based upon the facts and medical testimony, was related to the accident which occurred on October 5. We are loath, however, to reverse and to substitute our conclusions for those of the commission. It is our view that the case should be remanded for a further hearing so that both parties can submit such competent evidence as they deem advisable and the commission can explain its conclusions or reconcile them with the facts established by the record. We accordingly remand with directions for a hearing with leave to submit such further competent evidence as the parties may desire and for a determination in light of the evidence thereupon submitted. Hertz v. Watab Paper Co. 180 Minn. 177, 230 N. W. 481; Caddy v. R. Maturi & Co. 217 Minn. 207, 14 N. W. (2d) 393; Schulte v. C. H. Peterson Const. Co. 278 Minn. 79, 153 N. W. (2d) 130.

■ We must next consider the state's claim that this court lacks jurisdiction to review the commission's decision. It contends that the commission's original order of December 6, 1966, cannot be reviewed because certiorari was not applied for within 30 days thereafter and that our review of the commission's order of January 12, 1967, denying rehearing must be limited to the issue of whether or not the commission abused its discretion. Gartner v. Hogstad Fish Co. 229 Minn. 597, 38 N. W. (2d) 844; Id. 231 Minn. 419, 43 N. W. (2d) 798.

It is true that Minn. St. 176.471, subd. 1, requires the employee to act within 30 days from the date he was served with notice of the commission's order,[1] and that a party in interest may act within 30 days from an

---

[1] Minn. St. 176.471, subd. 1, provides: "Where the commission has made an award or disallowance of compensation or other order, if a party in interest acts within 30 days from the date he was served with notice of the order, he may have the order reviewed by the supreme court on certiorari upon one of the following grounds:

award or disallowance or "other order." It should also be noted that, until it is lost by certiorari, the commission retains jurisdiction for the purpose of reconsidering its decision, and it "may set the award aside and grant a new hearing" thereon and make such further disposition as shall in its judgment require. § 176.461.[2]

■ We held in Jones v. Flour City Ornamental Iron Works, 271 Minn. 42, 134 N. W. (2d) 586, that the commission has continuous jurisdiction so long as cause may be shown to set aside an award. It appears that in these proceedings, the employee, by his petition to vacate, sought to give the commission an opportunity to clarify, correct, or modify or in some way reconcile its conclusions with the uncontradicted facts as they appear in the record. The petition to vacate the award, which is before us, is carefully prepared and drawn and embodies all of the points giving rise to the issues we have discussed. By the time it was prepared and presented and the commission had an opportunity to act upon it, the 30-day period for certiorari had expired. The question then arises as to whether or not this circumstance limits our review to the issue of abuse of discretion or whether we are permitted to review the merits of the case on the basis of the entire record.

It seems to us that this question should be resolved in light of § 176.471, subd. 9, which provides that appeals from the Industrial Commission shall be governed by court rules governing appeals in civil actions. The statutes governing appeals in civil actions, Minn. St. 605.05, subds. 1 and 2, pro-

---

"(1) The order does not conform with this chapter; or,

"(2) The commission committed any other error of law; or,

"(3) The findings of fact and order were unwarranted by the evidence."

[2] Minn. St. 176.461 provides: "Except where a writ of certiorari has been issued by the supreme court and the matter is still pending in that court or where as a matter of law the determination of the supreme court cannot be subsequently modified, the commission, for cause, at any time after an award * * *, upon application of either party and not less than five days after written notice to all interested parties, may set the award aside and grant a new hearing and thereon determine the matter on its merits and make such findings of fact, conclusions of law, and award or disallowance of compensation or other order as the pleadings and the evidence produced before it and the provisions of this chapter shall in its judgment require."

240 240

vide that the supreme court on appeal "may reverse, affirm, or modify the judgment or order appealed from, or take any other action as the interests of justice may require."

In view of the broad powers of the Industrial Commission to retain jurisdiction for the purpose of correcting or modifying its decisions, together with the provisions of the law relating to appeals in civil cases, we feel that the merits of the case may properly be reviewed here. It seems entirely consistent with the language of the statutes and rules quoted that the Industrial Commission should retain jurisdiction for the purpose of hearing a petition to vacate or modify its orders preliminary to certiorari to this court; and that on review of the order denying such motion to vacate or modify this court may review the merits of all orders, examining the entire record bearing upon the issues, in the same manner as we might review orders on motion for a new trial under Rule 59, Rules of Civil Procedure, and Rule 103.04, Rules of Civil Appellate Procedure. Gran v. City of St. Paul, Bd. of Education, 274 Minn. 220, 143 N. W. (2d) 246.

Relator is allowed $250 attorneys' fees and his costs and disbursements in this court.

Reversed and remanded with directions.